**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BESPOKE SOURCING LIMITED D/B/A APPAREL LABS,<br><br>                              Plaintiff,<br><br>                    -v-<br><br>MIAMI LABS, INC. D/B/A JACK ARCHER, INC.,<br><br>                              Defendant. | Civil Action No.<br><br>**COMPLAINT** |

Plaintiff, BESPOKE SOURCING LIMITED D/B/A APPAREL LABS ("Plaintiff" or "Apparel Labs"), by and through its undersigned counsel Fox Rothschild LLP, files this Complaint against Defendant MIAMI LABS, INC. D/B/A JACK ARCHER, INC. ("Defendant" or "Jack Archer"), and states as follows:

**NATURE OF ACTION**

1.      This is an action arising out of Defendant's failure to pay millions of dollars in outstanding invoices for apparel purchased by Defendant from Apparel Labs and failure to complete the purchase of the 450,000 additional units of apparel pursuant to a Purchase and Sale of Goods Agreement dated August 16, 2023, and subsequent amendment to the Purchase and Sale of Goods Agreement dated September 12, 2024.

2.      In addition to Defendant's breach of the Purchase and Sale of Goods Agreement, this action also arises out of Defendant's deceitful conduct and manipulation of the parties' longstanding commercial relationship. Defendant's failure to pay its outstanding invoices and failure to complete the purchase of the 450,000 additional units of apparel was apparently precipitated by a failed internal business strategy implemented by Defendant's newly appointed

Chief Executive Officer, Emma Crepeau, which caused Defendant's sales to plummet by approximately forty (40) percent and created the alleged cash flow crisis underlying this dispute.

3.      Rather than acknowledge its own operational failures, Defendant fabricated claims of quality issues with Apparel Labs' products – issues that have never appeared during the parties' years long relationship and are contradicted by the highest-possible performance ratings that Defendant's own team assigned to Apparel Labs upon the transition to new management. Instead of satisfying its obligation under the Purchase and Sale of Goods Agreement, Defendant failed and refused to pay its outstanding debts, relying on its pretextual quality complaints that have nothing to do with the products that are subject to the outstanding invoices. Defendant caused Apparel Labs to suffer devastating financial harm, including likely insolvency, and the destruction of its supplier relationships across Vietnam, Bangladesh, and China.

## THE PARTIES

4.      Apparel Labs is a Hong Kong company with its principal place of business located at Rooms 1318-19, 13/F, Hollywood Plaza, 610 Nathan Road, Mongkok, Kowloon, Hong Kong

5.      Upon information and belief, Defendant is a Delaware corporation with its principal place of business located at 285 Madison Ave., 26th Floor, New York, NY 10017.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the amount controversy exceeds $75,000, exclusive of interest and costs, and because there is complete diversity of citizenship between Plaintiff and Defendant.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b) because Defendant's principal place of business is in New York, NY, which is within the jurisdiction of the Southern District of New York. Upon information and belief, all of Defendant's decisions

regarding its refusal and failure to failure to pay $3,079,190.66 in outstanding invoices for apparel purchased by Defendant from Apparel Labs and failure to complete the purchase of the 450,000 additional units of apparel were made from its corporate headquarters in New York. Upon further information and belief, Defendant's executives, including its Chief Executive Officer, Chief Financial Officer, and Chief Operating Officer are all based in its corporate headquarters in New York. The parties have also held meetings regarding the operative Purchase and Sale of Goods Agreement and related amendment at Defendant's corporate headquarters in New York.

## GENERAL ALLEGATIONS

**A.    The Purchase and Sale of Goods Agreement.**

8.    Apparel Labs is an international clothing manufacturing company that handles every aspect of production to ensure competitive pricing, timely deliveries, transparent payments and consistent communication.

9.    Upon information and belief, Miami Labs, Inc. is the owner of Jack Archer, Inc., which is a modern men's apparel brand known for its "Jetsetter" tech pants.

10.    On or about August 16, 2023, the parties entered into a Purchase and Sale of Goods Agreement (the "Agreement"), pursuant to which Apparel Labs (as "Supplier") agreed to supply and Defendant (as "Purchaser") agreed to purchase certain apparel products (the "Products") fully described in the Item Master Data ("IMD") attached as Exhibit A to the Agreement. A true and correct copy of the Agreement is attached hereto as **Exhibit A** and is incorporated herein by reference.

11.    Pursuant to the terms of the Agreement, Defendant expressly agreed to make timely payments to Apparel Labs in accordance with the payment schedule set forth in Article IV, Sections 4.1 and 4.2 of the Agreement.

12.     Specifically, Section 4.1 of the Agreement states that Apparel Labs shall invoice Defendant as follows: 20% upon acceptance of purchase order by Apparel Labs; 50% upon production completion; and the remaining 30% balance 40 calendar days after the production is complete.

13.     Section 4.2 of the Agreement states that Defendant shall make payments to Apparel Labs "within 10 business days after each invoice has been received, or as otherwise mutually agreed by both parties." Because the parties never agreed on any other payment deadline, all of Defendant's payments pursuant to any invoice received from Apparel Labs has always been due within 10 business days after receipt.

14.     On September 12, 2024, the Parties entered into the Amendment to the Agreement. A true and correct copy of the Amendment is attached hereto as **Exhibit B** and is incorporated herein by reference.

15.     Section 1.1 of the Amendment replaced Article IV, Section 4.1 of the Agreement and provides that Defendant shall make timely payments to Apparel Labs in accordance with a revised payment schedule.

16.     Specifically, the revised payment schedule in Section 1.1 of the Amendment states that Apparel Labs shall invoice defendant as follows: 10% upon acceptance of purchase order by Apparel Labs; 50% upon production completion; and the remaining 40% balance 40 calendar days after the production is complete. Any payment schedules that differ from Section 1.1 of the Amendment are specified in the actual invoices themselves.

17.     The Amendment also replaced the IMD with an updated list of Products that Defendant agreed to purchase from Apparel Labs, a copy of which was attached as Exhibit A to the Amendment.

4

18.    The Amendment did not alter in any way Defendant's obligation pursuant to Section 4.2 of the Agreement to make payments to Apparel Labs "within 10 business days after each invoice has been received, or as otherwise mutually agreed by both parties."

**B.    Defendant Breached the Purchase and Sale of Goods Agreement.**

19.    At all times, Apparel Labs performed its obligations under the Agreement, including the requirement that Apparel Labs invoice Defendant in accordance with Section 4.1 of the Agreement.

20.    Apparel Labs sent Defendant 53 invoices with invoice dates between April 29, 2025 through December 9, 2025 for Products ordered by Defendant for which Defendant either owed a 50% balance upon production completion, a remaining 40% balance within 40 calendar days of the production being completed, or an amount specified in the actual invoices themselves.

21.    Pursuant to Article IV, Section 4.2 of the Agreement, Defendant was required to pay the outstanding balance due for each invoice within 10 business days after each invoice had been received. No other arrangement for payment was made between the Parties for those 53 invoices.

22.    Despite the requirement that Defendant pay Apparel Labs any outstanding balance within 10 business days after each invoice has been received, Defendant has failed and refused to pay an outstanding balance of $3,079,190.66. True and accurate copies of these invoices are attached hereto as **Exhibit C**.

23.    Among the Products for which Defendant owed an outstanding debt, Apparel Labs delivered $2,607,561.99 worth of those Products to Defendant, despite having never been paid the outstanding balance. The Products delivered to Defendant are identified in invoices HB-BS-2025022 through HB-BS-2025067 of Ex. C.

24.     As of the date of this filing, the total contractual outstanding amount owed by Defendant to Apparel Labs is $3,079,190.66.

**C.     Defendant's Failure and Refusal to Pay Its Outstanding Debts to Apparel Labs is Based on Its Pretextual Lies Regarding the Quality of Apparel Labs' Products.**

25.     Defendant's breach of the Agreement was not the result of a good-faith dispute between the parties, but rather the product of Defendant's own internal financial failures and strategic mismanagement.

26.     Prior to Ms. Crepeau assuming her role as CEO in August 2025, Defendant was on track to generate $48 million in sales for FY 2025, with Apparel Labs supplying one hundred (100) percent of Defendant's Products. Following Defendant's transition of management, its sales declined by approximately forty (40) percent and continued to deteriorate throughout the remainder of the year, causing Defendant to miss all its stated Black Friday and seasonal sale targets and creating a cash flow crisis that ultimately caused Defendant to halt payments to Apparel Labs.

27.     Notwithstanding its mounting financial failures, Defendant, through its procurement and payments representatives Lucas Machado and Netta Bodman, affirmatively assured Apparel Labs in or around December 2025 that all outstanding debt would be paid within days and urged Apparel Labs to advance payments to its factories in China and Vietnam to maintain the agreed-upon delivery timelines. Acting in good faith and in reliance on Defendant's assurances, Apparel Labs advanced a total of $328,745.61 in payments December 19, 2025 and December 25, 2025, to its factories out of its own operating capital – a decision that directly caused Apparel Labs to exhaust its operating capital and ultimately forced it into insolvency.

28.     On January 2, 2026, Defendant's Vice President of Product, Adrienne Andrews, advised Apparel Labs for the first time that it would be placing a "temporary hold" on all payments

6

toward its outstanding debts as part of a "short-term financial review." Upon information and belief, Defendant's decision to place the "temporary hold" on all payments to Apparel Labs toward its outstanding debts was made before or contemporaneously with Mr. Machado and Ms. Bodman's December 2025 assurances that all outstanding debt would be paid within days.

29.     Later that month, Defendant's Chief Financial Officer, Paul Oakley, acknowledged its outstanding debt and informed Apparel Labs that Defendant was experiencing cash flow difficulties and needed to temporarily halt payments while it raised funds. Mr. Oakley assured Apparel Labs that Defendant would pay Apparel Labs in full as soon as possible. Despite Mr. Oakley's assurances, Defendant failed and refused to remit any portion of the $3,079,190.66 owed to Apparel Labs, and Defendant has since attempted to reduce or eliminate its payment obligations by asserting fabricated quality complaints, demanding improper discounts, and ultimately purporting to terminate the Agreement altogether.

30.     On February 3, 2026, and February 4, 2026, Apparel Labs' Chief Executive Officer, Justin Rocamora, and Chief Operating Officer, Patricio Laporta, met with Ms. Crepeau in Vietnam to visit the factories of Apparel Labs' suppliers and to discuss the parties' ongoing partnership. Ms. Crepeau assured that Apparel Labs would continue to exclusively service Defendant vis-à-vis the Agreement and further assured that Defendant would make a $220,000 payment by the end of February 2026, which would in turn allow Apparel Labs to pay its staff and factory workers and prevent Apparel Labs from closing its doors due to insolvency.

31.     It is clear that Defendant never had any intention of making any payments to Apparel Labs to satisfy any portion of its outstanding debts. In February 2026, Defendant then claimed, for the first time, to justify its failure and refusal to pay its outstanding debt due to alleged losses attributed to alleged product quality issues and asserted that Apparel Labs changed the fabric

7

composition of its "Jack Archer Jetsetter Pants" without authorization.

32.    With respect to the alleged quality issues, Article VI, Section 6.3 of the Agreement states that "[u]pon discovery defects in any Product, Supplier shall notify Purchaser in writing."

33.    Defendant did not notify Apparel Labs of any alleged product quality issues upon discovering them. Instead, on February 20, 2026, Ms. Crepeau notified Apparel Labs via email that it had experienced unspecified "repeated fit issues, fabric concerns, quality defects, and delivery disruptions" for the past 12 months.

34.    Defendant has not provided Apparel Labs with *any* documentation to substantiate its claim of alleged product quality issues.

35.    Instead of providing Apparel Labs with documentation to substantiate its claim of alleged product quality issues, Defendant claimed it was forced to liquidate its products at a discount without first advising Apparel Labs that there was an alleged quality issue. Once Defendant sold those Products, it sought a discount on its outstanding debt to make up for its lost profits and disguise its poor sales as a non-existent quality issue.

36.    With respect to the fabric change, Apparel Labs informed Defendant in February 2025 that a fabric change was required because the original fabric contained per- and polyfluoroalkyl substances ("PFAs"), rendering the product illegal for sale in certain states. Mr. Machado acknowledged and approved the fabric change in a voice memo in February 2025, and Ms. Crepeau acknowledged that the fabric change had been necessary given the applicable legal prohibition on the sale of PFA-containing products during a meeting in New York on March 3, 2026.

37.    Defendant has since claimed that the fabric change was unauthorized, and that Apparel Labs was required to use a Solotex-branded product. Both are false – Defendant expressly

authorized the fabric change, and the Agreement does not require Apparel Labs to use a Solotex-branded product. Despite this reality, Defendant sought a discount on its outstanding debt due to the fabric change.

**D.    Defendant Interferes with Apparel Labs' Relationships with Its Suppliers.**

38.    Apparel Labs maintained longstanding, valuable, and ongoing business relationships with its manufacturing suppliers in Vietnam, Bangladesh, and China, many of which Apparel Labs had cultivated over a period of seventeen (17) years. These supplier relationships constituted the foundation of Apparel Labs' business operations, enabling Apparel Labs to manage the complete supply chain – from fabric mills, to forwarders, to accessories suppliers, to cut-and-sew factories – and to offer favorable commercial terms to its clients, including Defendant. Apparel Labs also maintained active productions with these same suppliers on behalf of other clients, generating substantial annual profits independent of its relationship with Defendant.

39.    Upon information and belief, Defendant had actual knowledge of these business relationships and was specifically aware of Apparel Labs' contractual relationship with its Chinese and Vietnamese supplier Jinan Aizela Commerce Co. Ltd., and its Bangladeshi supplier SKOPE Apparels FZCO. Defendant was aware that Apparel Labs served as the intermediary between Defendant and the factories that manufactured Defendant's products, that Apparel Labs maintained its own independent contractual arrangements and payment terms with those factories, and that Apparel Labs' ability to service Defendant and its other clients depended on preserving those supplier relationships.

40.    Defendant was further aware that Apparel Labs' supplier relationships were under severe financial stress as a direct result of Defendant's own conduct. Defendant knew that it owed Apparel Labs millions in unpaid invoices, that Apparel Labs had advanced its own operating

capital to factories at Defendant's request, and that Apparel Labs was unable to satisfy its outstanding payment obligations to its suppliers because of Defendant's failure to remit payment.

41.     With full knowledge of this financial context, on January 27, 2026, Mr. Oakley demanded that Apparel Labs arrange a direct discussion between Defendant and Apparel Labs' supplier in Bangladesh, or alternatively that Apparel Labs provide the supplier's contact details so that Defendant could "connect directly" with the factory. Mr. Oakley's stated purpose was to persuade the factory to release approximately 3,000 units of finished Products without first paying the outstanding debts to Apparel Labs. Mr. Oakley also indicated that Defendant would not offer any proposal to satisfy its outstanding debts to Apparel Labs without Apparel Labs disclosing the contact information of its suppliers.

42.     Defendant sought to intentionally interfere with its contractual relationship with its supplier in Bangladesh, as it has done with all of its suppliers by refusing to pay its outstanding debts to Apparel Labs while knowing that Apparel Labs was unable to satisfy its contractual obligations to its suppliers Jinan Aizela Commerce Co. Ltd. and SKOPE Apparels FZCO as a result.

**E.    Apparel Labs Suffered Consequential Damages, Including Lost Profits and Reputational Harm Due to Defendant's Breach of the Purchase and Sale of Goods Agreement.**

43.     In October 2025, Defendant agreed to purchase a quantity of 450,000 "Jack Archer Jetsetter Pants" from Apparel Labs in exchange for a discounted rate.

44.     On October 22, 2025, Apparel Labs sent Defendant an invoice to pay a 2% deposit in the amount of $145,980 for 450,000 pairs of "Jack Archer Jetsetter Pants." A true and correct copy of that invoice is attached hereto as **Exhibit D**.

45.     Defendant paid the $145,980 deposit on October 28, 2025.

10

46.    On February 10, 2026, after Defendant breached the Agreement by failing to pay its outstanding balance of $3,079,190.66, Sonya Jones, Defendant's Director of Product Merchandising, advised Apparel Labs that it intends to "halt moving forward" on completing the purchase of the 450,000 pairs of "Jack Archer Jetsetter Pants."

47.    As a result of Defendant refusing to complete the purchase of 450,000 pairs of "Jack Archer Jetsetter Pants," Apparel Labs suffered a loss in profits equal to $1,350,000.

48.    As a result of Defendant's failure to pay outstanding invoices and refusal to complete the purchase of 450,000 pairs of "Jack Archer Jetsetter Pants," Apparel Labs also suffered substantial and irreparable reputational harm amongst suppliers in the industry. On numerous occasions, Apparel Labs had to cancel production, cease production, or have its suppliers withhold delivery of items requested by Defendant, which has caused a significant lack of trust in Apparel Labs by its suppliers.

49.    As a result of Defendant's failure to pay outstanding invoices and refusal to complete the purchase of 450,000 pairs of "Jack Archer Jetsetter Pants," Apparel Labs currently owes $1,551,278 to its own suppliers in Vietnam, Bangladesh, and China—all of which relate to the Products completed exclusively for Defendant. Apparel Labs faces the prospect of litigation from those suppliers, blacklisting from conducting further business in China and Vietnam, and the loss of supplier relationships upon which it depends to service its remaining client base. Apparel Labs also faces the permanent loss of seventeen (17) years of reputation and professional work in the international apparel manufacturing industry.

50.    As a result of Defendant's refusal to complete the purchase of 450,000 pairs of "Jack Archer Jetsetter Pants," one of Apparel Labs' primary suppliers located in Vietnam was forced to close, and Apparel Labs is unable to do business in Vietnam.

51.     At the time Apparel Labs and Defendant entered into the Agreement, it was reasonably foreseeable that a breach by Defendant, including, without limitation, its failure to pay outstanding invoices and refusal to complete orders, would cause Apparel Labs to suffer lost profits and reputational harm. The nature of the Agreement, which governed a commercial transaction for the sale of Products in substantial quantities, made it apparent that any failure by Defendant to perform would deprive Apparel Labs of the profits it expected to earn from the Agreement.

52.     The parties expressly or impliedly understood and contemplated, at the time they entered into the Agreement, that Apparel Lab's ability to generate profits from the Products was entirely dependent on Defendant's performance of its payment and purchase obligations under the Agreement. This is reflected in Article IX, Section 9.1 of the Agreement, pursuant to which Apparel Labs agreed that it would not manufacture or supply the same Products to any other party for sale. Defendant was aware, or reasonably should have been aware, at the time of entering into the Agreement that it is Apparel Labs' only source of revenue from the Products.

53.     The lost profits and reputational harm suffered by Apparel Labs are directly and casually traceable to Defendant's breach of the Agreement. But for Defendant's failure to pay outstanding invoices and refusal to complete orders, Apparel Labs would have realized a profit of $1,350,000 from the sale of 450,000 pairs of "Jack Archer Jetsetter Pants" and would not have suffered reputational harm to its relationship with its suppliers.

54.     The Agreement does not contain a provision limiting or preventing an award of consequential damages.

**F.      Defendant Improperly Terminates the Purchase and Sale of Goods Agreement.**

55.     Section 1.2 of the Amendment replaced Article XII, Section 12.3 of the Agreement

and provides that "either party may terminate the Agreement [f]or convenience by providing 12 months' prior written notice of termination to the other party."

56.     The purpose of the twelve (12) month written notice requirement is to provide Apparel Labs with sufficient time to cease business operations that were implemented to specifically service Defendant, including cutting staff and ceasing production.

57.     On March 16, 2026, Defendant notified Apparel Labs for the first time that it intends to terminate the Agreement effective immediately, claiming that it had "no validity." Defendant did not provide Apparel Labs with the twelve (12) month written notice required by Section 1.2 of the Amendment.

58.     On March 23, 2026, Defendant sent Apparel Labs a notice of termination, by which Defendant terminated the Agreement and Amendment due to Apparel Labs allegedly breaching the Agreement. A true and correct copy of the notice of termination is attached hereto as **Exhibit E**.

59.     Because Defendant did not provide Apparel Labs with the required notice, Apparel Labs has no time to wind down business operations while generating cash flow from Defendant, which will force Apparel Labs into further financial ruin as it will be unable to pay its employees or suppliers.

**COUNT 1**
**(BREACH OF CONTRACT)**

60.     Apparel Labs repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

61.     The Agreement and Amendment thereto constitute valid, and enforceable agreements.

62.     As set forth above, Apparel Labs has performed all conditions, covenants, and

obligations required of it under the Agreement, including the manufacture and delivery of Products and the proper invoicing of Defendant in accordance with Section 1.1 of the Amendment.

63.    As further set forth above, Defendant has materially breached the Agreement by failing to pay the remaining balance due on 53 invoices totaling $3,079,190.66.

64.    Defendant's breach was not excused by any provision of the Agreement or Amendment thereto, any applicable law, or any conduct of Apparel Labs.

65.    As a direct and proximate result of Defendant's material breach of the Agreement, Apparel Labs  has suffered, and continues to suffer, millions of dollars in damages, together with interest, consequential damages, lost profits and reputational harm, incidental damages, and such other damages as may be proven at trial.

## COUNT II
### (UNJUST ENRICHMENT, IN THE ALTERNATIVE)

66.    Apparel Labs repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

67.    Apparel Labs conferred benefit upon Defendant by designing, manufacturing, and delivering $2,607,561.99 worth of Products, which Defendant received and accepted.

68.    Defendant had knowledge of the benefit conferred upon it by Apparel Labs. Specifically, Defendant accepted delivery of the Products and retained possession of the Products, despite having knowledge that Apparel Labs had not been paid the outstanding balance due and owing for the Products.

69.    Notwithstanding its receipt, acceptance, and continued retention of the Products, Defendant has failed and refused to pay Apparel Labs the outstanding sum of $2,607,561.99, or any portion thereof. Defendant has been unjustly enriched at the direct expense of Apparel Labs by retaining the full benefit of the Products without providing any compensation.

14

70.     As a direct and proximate result of Defendant's unjust enrichment, Apparel Labs has suffered $2,607,561.99 in damages, together with interest, consequential damages, lost profits and reputational harm, incidental damages, and such other damages as may be proven at trial.

**COUNT III**
**(PROMISSORY FRAUD)**

71.     Apparel Labs repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

72.     At all times relevant to this action, Defendant, acting by and through its authorized agents, representatives, and officers, made false promises of future payment to Apparel Labs with knowledge of their falsity and with the intent to induce Apparel Labs to act in reliance thereon, causing Apparel Labs to suffer substantial damages distinct from and in addition to those arising from Defendant's breach of the Agreement.

73.     Through its procurement and payment representatives Mr. Machado and Ms. Bodman – with whom Apparel Labs had dealt with directly for years – Defendant expressly represented to Apparel Labs that it would remit payment of all outstanding debt owed to Apparel Labs within a matter of days. Acting within the scope of their authority on behalf of Defendant, Mr. Machado and Ms. Bodman urged Apparel Labs to advance payments to its manufacturing facilities in China and Vietnam to preserve its delivery timelines.

74.     Through its CFO Mr. Oakley, Defendant further assured Apparel Labs that it would pay its outstanding debts as soon as possible.

75.     Defendant's CEO, Ms. Crepeau, even promised that Defendant would pay its outstanding debts and further promised to make a $220,000 payment by the end of February 2026, which would in turn allow Apparel Labs to pay its staff and factory workers and prevent Apparel Labs from closing its doors due to insolvency.

15

76.     All the statements made by Defendant were false – Defendant had already determined internally to halt all payments to Apparel Labs and had no present intention of remitting the promised payments. Mr. Machado, Ms. Bodman, Mr. Oakley, and Ms. Crepeau's assurances were all made after Defendant decided to halt payments to Apparel Labs. Defendant's statements were made with the intent to induce Apparel Labs to advance prepayments to its factories in China and Vietnam using Apparel Labs' own operating capital, thereby ensuring that Defendant's production timelines were maintained while Defendant simultaneously concealed its intention to halt all payments.

77.     Apparel Labs justifiably relied on the representations of Mr. Machado, Ms. Bodman, Mr. Oakley, and Ms. Crepeau. Apparel Labs had dealt with these individuals directly in their capacity as Defendant's authorized representatives, some for several years, and had no basis to believe that the payment assurances communicated by those representatives were false.

78.     Acting in direct and reasonable reliance on Defendant's representations, Apparel Labs advanced prepayments to its manufacturing facilities in China and Vietnam from its own operating capital.

79.     The harm Apparel Labs suffered because of its reliance on Defendant's misrepresentations is distinct from and not merely duplicative of the breach of contract damage arising from the unpaid invoices. Specifically, Defendant's fraudulent inducement directly caused Apparel Labs to exhaust its entire operating capital reserve in factory prepayments, which in turn caused Apparel Labs' insolvency. But for Defendant's fraudulent assurances, Apparel Labs would not have advanced those prepayments and would have retained sufficient operating capital to continue its business operations. Had it known Defendant had no intent to pay its outstanding debts, Apparel Labs would have taken identifiable protective measures, such as halting production,

16

ceasing shipments, or exercising contractual remedies.

80.     As a direct and proximate result of Defendant's promissory fraud, Apparel Labs has suffered, and continues to suffer, damages in $328,745.61 reflecting capital advances Apparel Labs would not have made but for Defendant's false promises, together with interest, consequential damages, lost profits and reputational harm, incidental damages, and such other damages as may be proven at trial.

## COUNT IV
## (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

81.     Apparel Labs repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

82.     Under Delaware law, every contract carries an implied covenant of good faith and fair dealing, which obligates each party to refrain from conduct that would deprive the other party of the benefit of its bargain or that would exploit contractual gaps or silences in a manner inconsistent with the reasonable expectations of both parties at the time of contracting

83.     Defendant violated the implied covenant of good faith and fair dealing through a sustained course of conduct designed to deprive Apparel Labs of the benefit of the Agreement, including: (i) demanding substantial discounts on its outstanding debts based on its manufactured claims of product quality issues, none of which have been substantiated by Defendant; (ii) demanding substantial discounts on its outstanding debts based on its manufactured claim that it did not authorize the fabric change and that the fabric change did not comply with the Agreement; and (iii) terminating the Agreement based on its manufactured claims of product quality issues and claim that it did not authorize the fabric change, which would force Apparel Labs into trigger financial ruin.

84.     As a direct and proximate result of Defendant's material breach of the Agreement,

17

Apparel Labs has suffered, and continues to suffer, millions of dollars in damages, together with interest, consequential damages, lost profits and reputational harm, incidental damages, and such other damages as may be proven at trial.

**COUNT V**
**(TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP)**

85.    Apparel Labs repeats and realleges each of the foregoing paragraphs as if fully set forth herein.

86.    At all times relevant to this action, Apparel Labs maintained longstanding, valuable, and ongoing business relationships with its manufacturing suppliers in Vietnam, Bangladesh, and China, Jinan Aizela Commerce Co. Ltd. and SKOPE Apparels FZCO, both of which Defendant was aware of.

87.    Defendant intentionally interfered with Apparel Labs' relationship with its suppliers, including by demanding that it speak directly with the suppliers to coerce them to release Products without payment and by refusing and failing to satisfy its outstanding debts to Apparel Labs while knowing that Apparel Labs required payment in order to satisfy its obligations pursuant to the respective agreements with its suppliers.

88.    Defendant's tortious interference with Apparel Labs' contractual relationship with its suppliers was unjustified. Defendant has no right to refuse and fail to satisfy its outstanding debts to Apparel Labs, which Defendant knew Apparel Labs needed in order to satisfy its contractual obligations to its suppliers. Defendant similarly had no right to demand to speak directly with Apparel Labs' suppliers, demand release of Products for which the outstanding debt remained unpaid, or to condition a proposed payment of its outstanding debt to Apparel Labs on Apparel Labs' surrender of its proprietary supplier contacts. Defendant's interference was motivated by its desire to avoid its obligations under the Agreement at the detriment of Apparel

Labs' relationships with its suppliers.

89.    As a direct and proximate result of Defendant's tortious interference with Apparel Labs' contractual relationship with its suppliers and business relationships, Apparel Labs has suffered, and continues to suffer, millions of dollars in damages, together with interest, consequential damages, lost profits and reputational harm, incidental damages, and such other damages as may be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Apparel Labs respectfully demands judgment in its favor and against Defendant as follows:

a)    Millions of dollars in compensatory damages in an amount to be determined at the time of trial;

b)    Millions of dollars of incidental and consequential damages, including lost profits and reputational harm, in an amount to be determined at trial;

c)    Pre- and post-judgment interest at the maximum rate permitted by law; and

d)    Such other, further and different relief as this Court deems just and proper.

Dated: March 25, 2026

**FOX ROTHSCHILD LLP**

 /S/ Brett Berman_____
Brett Berman
Jacob Zucker
101 Park Avenue, 17th Floor
New York, NY 10178
Telephone: 212-878-7900
Facsimile: 212-692-0940
bberman@foxrothschild.com
jzucker@foxrothschild.com

*Attorneys for Plaintiff Bespoke Sourcing Limited d/b/a Apparel Labs.*